20181ixus

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x
     UNITED STATES OF AMERICA
3

4              v.                          16 Cr. 10(KMK)

5                                          SENTENCE

6    JIAQIANG XU,

7                    Defendant.
     ------------------------------------x
8

9                                          United States Courthouse
                                           White Plains, N.Y.
10                                         January 18, 2018

11

12

13

14   Before:   THE HONORABLE KENNETH M. KARAS, District Judge

15

16
                              APPEARANCES
17

18   GEOFFREY S. BERMAN
          United States Attorney for the
          Southern District of New York
19   BENJAMIN R. ALLEE
          Assistant United States Attorney
20

21
     ALSTON & BIRD, LLP
22        Attorneys for Defendant
     LEANNE MAREK
23   DANIEL DIFFLEY

24

25   Also present:  PATSY ONG, Chinese Interpreter
                     JOSEPH ALTIMARI, FBI

                 CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                            (914)390-4103

1           THE DEPUTY CLERK:  The Honorable Kenneth M. Karas

2     presiding.

3           United States of America against Jiaqiang Xu, 16 CR

4     10.

5           Counsel, please note your appearances for the record.

6           MR. ALLEE:  Good afternoon, your Honor.  Benjamin

7     Allee for the government.  With me is Special Agent Joseph

8     Altimari with the FBI.

9           THE COURT:  Good afternoon to you both.

10           MS. MAREK:  Good afternoon, your Honor.  Leanne Marek

11     on behalf of the defendant.  With me is Dan Diffley.  He's now

12     to the case.  Mr. Brown had to step aside as he was recently

13     appointed and confirmed to the Federal Bench in the Northern

14     District of Georgia.  So, for obvious reasons, he couldn't be

15     here.  And Mr. Diffley agreed to step in and help me out.

16           THE COURT:  Welcome.  Good to see you again.

17           Please be seated.

18           MR. DIFFLEY:  Thank you.

19           THE COURT:  Please pass on my congratulations to

20     Mr. Brown.

21           MS. MAREK:  I will.

22           THE COURT:  I have to ask, did you make the flight

23     that day back in May?

24           MR. ALLEE:  Yes.  At the plea hearing.  We did make

25     the flight.

1             THE COURT:  Okay.

2             MS. MAREK:  We rushed and we make it, yes.

3             THE COURT:  Okay.  I actually felt so badly for you

4   all.

5             MS. MAREK:  If not, we were just going to drive back

6   to Hartford and spend another weekend of the trial in Hartford.

7             THE COURT:  Yes, sure.

8             MS. MAREK:  But we did make the flight.  Thank you

9   for that.

10            THE COURT:  Okay.  Good.  I'm glad to hear that.

11            So we're here for sentencing.

12            The presentence report I've read was last revised on

13   December 11th.  Is that the most recent report you all have?

14            MR. ALLEE:  Yes, your Honor.

15            THE COURT:  Okay.

16            And then, on behalf of Mr. Xu, I've read the

17   following.  There is the initial sentencing memorandum that was

18   filed November 30th.  And, of course, I've read through the

19   exhibits.  And then there was a supplemental submission.  I'll

20   pull that up.  I thought I had collected everything.

21            (Pause)

22            THE COURT:  I may have left the supplemental

23   submission.  I've read it, but, while we look for that, the

24   government submitted its sentencing memorandum dated December

25   8th.  And then there was a letter December 8th, as well, that's

1        going to be filed under seal.

2               At least from the government's perspective, have I

3        left anything out?

4               MR. ALLEE:  No, your Honor.

5               THE COURT:  Okay.

6               I promise you, I've read your supplemental

7        memorandum.  I just can't find it.  So have I not mentioned

8        anything that you've submitted?

9               MS. MAREK:  No, your Honor.  That's everything.

10              THE COURT:  And have you had enough time to go over

11       the presentence report with Mr. Xu?

12              MS. MAREK:  We have.

13              THE COURT:  Are there any objections other than the

14       loss amount?

15              MS. MAREK:  No.  That's all.  Just loss amount.

16              THE COURT:  Okay.  And we'll certainly have a hearty

17       conversation about that momentarily.

18              MS. MAREK:  Sure.

19              THE COURT:  Mr. Allee, have you reviewed the report?

20              MR. ALLEE:  Yes, your Honor.

21              THE COURT:  Any objections?

22              MR. ALLEE:  No, your Honor.

23              THE COURT:  Okay.

24              I think what makes sense to do is to resolve the loss

25       amount issue and then, once we do that, then we can go into the

1    3553(a) factors.  Does that sound okay?

2                MS. MAREK:  Certainly.

3                Mr. Diffley is going to resolve the loss amount issue

4    with you, Judge, and then I'll handle the argument on the

5    3553(a) factors.

6                THE COURT:  Okay.  All right.

7                By the way, I have your supplemental submission.

8                MS. MAREK:  All right.

9                THE COURT:  So, Mr. Diffley, the the floor is yours.

10               MR. DIFFLEY:  Thank you, your Honor.

11               Your Honor, good afternoon.

12               THE COURT:  Good afternoon.

13               MR. DIFFLEY:  May it please the Court.

14               We are going to start with the loss amount.  As the

15   Court just pointed out, that's really the issue of dispute.

16   That's our objection to the PSR.  And it's a pretty vast --

17   obviously, we have a vast disagreement with the government

18   about the loss amount.

19               The guidelines require a finding of loss amount, and,

20   in this case, we are only talking about intended loss.  We are

21   not talking about actual loss.  That's clear from the

22   submissions and the December letter that the government

23   submitted to you.  And so the question, then, is intended loss.

24               Well, what is intended loss?  Under the sentencing

25   guidelines, intended loss means the pecuniary harm that the

1    defendant purposely sought to inflict.  And in this case, it

2    has a little bit of a history, and the loss amount has changed.

3    In the initial PSR that was submitted earlier in this case, it

4    was in the range of $65 million and now we are down in the PSR

5    to a range of $9.5 to $25 million.  That's paragraph 33 of the

6    most recent PSR.  In reality, your Honor, in this case, the

7    loss amount should be zero.

8         It is the government's burden.  The government has

9    the burden to establish by a preponderance of the evidence the

10   loss amount.  And it's really a legal question first, Judge.

11   And that legal question before the Court is, before we get into

12   the numbers and the adequacy of what was provided, can the

13   government rely on the concept of development costs to prove

14   the loss amount?

15        Now, the commentary provides -- to the sentencing

16   guidelines, the commentary provides that development costs can

17   be used when the circumstances are appropriate, but, as the

18   case law that we've cited from the Tenth Circuit and the

19   Seventh Circuit that have looked at this very question, those

20   Courts have said that development costs are not a substitute

21   for the government to prove actual costs.  And what the

22   government would need to do here, when we're talking about

23   intended loss, is demonstrate evidence that the defendant

24   intended to deprive the victim company of those amounts that

25   were their development costs, and, here, there is no evidence

1    of that at all.  It hasn't been submitted.

2              And, your Honor, I urge the Court to look closely at

3    the cases that we cited, one out of the Seventh Circuit and --

4              THE COURT:  Yes, I've read them.

5              MS. MAREK:  -- one out of the Tenth Circuit.

6              They are very similar situations as here.

7    Particularly, the Seventh Circuit case in, I believe it's

8    pronounced Po, P-O.  There, we have a defendant who admitted to

9    stealing certain computer files while he was with his employer,

10   and the Court relied on $12 million in development costs for

11   the intended loss in this case.  The Seventh Circuit rejected

12   that approach.  As they held in that case, the Court must

13   determine whether the record supports a finding that it was

14   more likely than not that the defendant intended to cause a

15   loss to the victim that equaled the cost of development.

16   There, they concluded it did not.  There was no direct evidence

17   of how much of a loss that the defendant intended for the

18   companies to suffer.  And they further found that there was not

19   a substitute.  You cannot use the development costs as a

20   substitute for the government's burden to prove the actual

21   loss.

22             We cited the Snowden case out of the Tenth Circuit.

23   Very similar circumstances.

24             THE COURT:  S-N-O-W-D-E-N.

25             MR. DIFFLEY:  And not the infamous --

1              THE COURT:  Not the other guy.

2              MR. DIFFLEY:  Right.  Not the infamous Snowden.

3              In this case, the Tenth Circuit sent down something

4       very similar.

5              So, your Honor, we start with what's the legal

6       standard and should we even be talking about development costs,

7       should we be even looking at numbers for development costs, and

8       the answer, as set forth in those two cases, is no.

9              Moving forward, though, your Honor, even if we're

10      going to move past that and look at what has been submitted,

11      the two exhibits submitted by the government are woefully

12      insufficient in meeting their burden.

13             I'm sensitive to the request that the prosecutors

14      have made that we keep certain information under seal, or out

15      of the public, but I can -- your Honor, you're familiar with

16      the two exhibits that were attached to the government's letter

17      to you --

18             THE COURT:  Yes.  I have them.

19             MR. DIFFLEY:  -- filed under seal.

20             Looking at this alone, for example, the first exhibit

21      they show to us is budgeted development costs.  Your Honor, we

22      don't know, sitting here, whether the budgeted costs were

23      actually spent or incurred.  It's just a budget.  This is a

24      snippet from what appears to it be an Excel spreadsheet with

25      some columns and, frankly, some meaningless information,

1    certainly not enough to show that, in this case, the defendant

2    intended to cause these particular specific numbers that are

3    identified on there as loss to the victim company.

4              Similarly, the second slide, which just says sales

5    revenue, references millions of dollars and certain numbers.

6    We don't know what was sold in this.  We don't know which

7    version of GPFS, which was the software code at issue here, was

8    used.  We don't know what's included in really any of this.

9    It's woefully short.  But, again, it's the wrong thing to be

10   looking at anyway.

11             THE COURT:  Hang on.  So why is that?  Because I

12   understand the argument with respect to development costs, but

13   development costs are just one way the government is asserting

14   that the loss amount should be calculated here.  Right?

15   Because, to the extent that there were sales based off of the

16   proprietary information, why would that not be another way to

17   at least assess the sort of market value that the proprietary

18   information provided to the company?

19             MR. DIFFLEY:  Your Honor, it could.  Let's talk about

20   sales revenue.  We pointed to, in our brief, one specific sale

21   of the defendant's company made.  It was $320,000.

22             THE COURT:  Right.

23             MR. DIFFLEY:  Arguably, yes, that could be considered

24   as evidence of loss in this case, but that's very different

25   from development costs.  The other things that --

1          THE COURT:  No, I agree, but getting back to -- so

2     the revenue streams from the proprietary information help

3     assign a market value to the information.  And to the extent,

4     yes, there's been one sale of $300,000, that doesn't mean that

5     the market value of what was stolen isn't a lot more than

6     $300,000, because there could have been -- if your client

7     hadn't been arrested, there could have been endless numbers of

8     transactions that reflect the value of what was taken.

9          MR. DIFFLEY:  It could have been, your Honor.  There

10    could have, you're right.  But that is just speculating at one

11    point as to whether there could have been additional sales in

12    the marketplace.

13         THE COURT:  But I don't think it's speculation where

14    your client sets up a brand new company and, really, the main

15    thing that they're pitching here is software that's based on

16    the proprietary information that was stolen from the company.

17    And they have their own sort of revenue stream projections,

18    which I realize there may be other products they were going to

19    sell, but there's no doubt that this was going to be, if you

20    will, the sort of shiny toy that was going to be marketed by

21    your client and the people in this company.  And the company

22    had a fair amount of men and they had a lot of employees.  I

23    mean, this is not some rinky-dink operation.

24         And so, in terms of looking at value and what was

25    intended to be sold here by your client, $300,000 seems to be

1    way short.

2              MR. DIFFLEY:  Well, your Honor, as it relates to the

3    valuation of the company, which was called Zettakit -- that's

4    the name of the company --

5              THE COURT:  Yes.

6              MR. DIFFLEY:  -- we have to look at that separately

7    when we look at the individual defendant.  This is not a charge

8    against Zettakit as the entity.

9              THE COURT:  No, I get that.

10             MR. DIFFLEY:  The valuation of Zettakit and the

11   information that they had in the marketplace about their sales

12   and about their revenues --

13             THE COURT:  But when was the company started?  Was it

14   started before or after your client left the other company?

15             MR. DIFFLEY:  It was after.  Well, he joined it

16   after.  Your Honor, it was started before.

17             THE COURT:  And what were the revenue streams before

18   he joined it?

19             MR. DIFFLEY:  We don't have that information, your

20   Honor.

21             THE COURT:  All right.  I mean, it was -- okay.

22   Anyways, go ahead.

23             MR. DIFFLEY:  We don't have that information.  But

24   that is looking at, again, Zettakit as an entity as opposed to

25   the individual harm that was caused here.  And again, your

1    Honor, there's nothing to demonstrate the connection of

2    intended loss, that there were any specific amounts intended to

3    take from the victim company.

4            And on that, there is value, and we haven't disputed

5    that.  We think we could look at the particular sale as

6    evidence of what that value might look like in the marketplace,

7    but this is not a situation where the company that has been

8    charged -- or the individual who worked for the company has

9    been charged is trying to replace the competitor in the

10   marketplace or shut the competitor out of the marketplace.

11           Your Honor, the only other point that I would add is

12   that the revenue that Zettakit received would be considered a

13   gain, but that gain can only be considered -- excuse me --

14   should only be used if the government has shown a loss.  And

15   that comes back to where I started.  Here, the government just

16   hasn't connected the dots.  They started at a high number.

17   They've brought it down.  Again, we think it's zero.  It's

18   their burden.  We do not believe that they have met their

19   burden, either development costs, whether the Court's going to

20   consider those, or any other market evidence to demonstrate an

21   actual -- or, excuse me -- an intended loss.

22           THE COURT:  So in order for you to say that there's

23   no loss, don't you have to win the argument that what was

24   stolen had no value?  I mean, it clearly had value.  They've

25   made millions of dollars off of the proprietary information.

20181ixus

1    So I don't know how your starting point is zero.

2            MR. DIFFLEY:  Well, your Honor, it certainly had --

3    remember, we're not talking about actual loss, so we're not

4    talking about lost sales or lost customers.

5            THE COURT:  I understand.  We're talking about the

6    value of what was stolen.

7            MR. DIFFLEY:  Right.  And under an intended the loss,

8    which requires some connection between what the defendant took

9    and some showing of the intent to cause pecuniary harm to the

10   victim.  So, yes, there is value.  We haven't contested that.

11   What we're contesting is that they haven't connected the dots

12   here to demonstrate any real intended loss or, ultimately, any

13   actual harm at the end of the day.

14           THE COURT:  So the notes to 2B1.1, and, in

15   particular, Note (3)(c), talks about estimation of loss.

16           MR. DIFFLEY:  Yes.

17           THE COURT:  It says, "The estimate of the loss shall

18   be based on available information, taking into account, as

19   appropriate and practicable under the circumstances, factors

20   such as the following," and the first one says, "the fair

21   market value of the property unlawfully taken, copied or

22   destroyed or, if the fair market value isn't practicable to

23   determine or is inadequate to measure the harm, the cost of the

24   victim replacing that property."

25           So it's not a replacement cost necessarily, but it

1  had value.  What he took had value.  And I don't know how you

2  can't say that that value couldn't even be somewhat quantified

3  by the millions of dollars of sales that the company had

4  achieved as a result of the proprietary information.

5          MR. DIFFLEY:  Your Honor, it could be.  That could be

6  a viable means.  I don't disagree with that.  But our whole

7  point on this is, if that's what the government's theory or

8  model is, that's not what they have presented in this case.

9  These revenues, again, we're talking about four item entries at

10 a bottom of a spreadsheet.

11         THE COURT:  Yes.

12         MR. DIFFLEY:  And, again, that doesn't -- it just

13 says a certain type of scale revenue on there.  It doesn't

14 contain any breakdown.

15         THE COURT:  But, no, what the letter says is that --

16 it does connect the dots.  It says that the sales revenues

17 summarizes the revenue generated by the proprietary software

18 worldwide and in China for those years.  So there's a direct

19 connection between the sales from the stolen proprietary

20 information both worldwide and in China.  And so that's

21 millions of dollars.

22         MR. DIFFLEY:  It is.  But it doesn't, for example,

23 say which version of the software.  It doesn't verify that the

24 software --

25         THE COURT:  Why does that matter?  I mean, to the

1    extent that there is sort of this core intellectual property

2    that has taken them 30 years to develop and they've been using

3    this to generate sales in the millions of -- tens of millions

4    of dollars, the fact that there might be tweaks here and there,

5    tweaks that were made maybe by the company or made by your

6    client, doesn't somehow dilute the value to nothing.

7           MR. DIFFLEY:  It probably does not dilute it to

8    nothing, your Honor.  I'm not trying to say that it's nothing.

9    But it does raise questions that aren't answered.

10          For example, a software has version one, version two,

11   version three.  What if version three took out some of the code

12   that was taken by the defendant.  We don't know.  There's just

13   so many issues with what has been provided here when it is

14   their burden to establish that.  Have they given us some

15   numbers?  Yes.  Have they met their burden here to show that

16   this is the actual value of -- market value of what was taken

17   by the defendant?  Your Honor, they have not.

18          THE COURT:  Okay.  All right.

19          Anything else, Mr. Diffley?

20          MR. DIFFLEY:  Nothing on this issue unless --

21   depending on what the government has to say.

22          And, as Ms. Marek said, she will be handling the rest

23   of the arguments.

24          THE COURT:  And if there's anything Mr. Allee says

25   you want to reply to on this issue, of course you'll get as

1    much time as you need to reply.

2              MR. DIFFLEY:  Sure.  Thank you.

3              THE COURT:  Thank you, Mr. Diffley.

4              Mr. Allee.

5              MR. ALLEE:  Thank you, your Honor.

6              Our position is that the reasonably estimated loss

7    here is between nine-and-a-half million and twenty-five million

8    dollars that results in a 20-level enhancement for purposes of

9    the sentencing guidelines.

10              The facts here that bear on this enhancement can be

11   summed up as follows.  The defendant stole something very

12   valuable.  He stole it from the victim company.  It is a trade

13   secret.  It's a piece of intellectual property.  It took over

14   30 years to develop.  The development of it created a series of

15   versions -- counsel referred to versions of it -- which were

16   built upon each other.  They're not strands or off-shoots or --

17              THE COURT:  Right.  They're not severed.  They're all

18   based on some sort of core intellectual property.

19              MR. ALLEE:  Yes, your Honor.  It's one evolution.

20   It's not different species.  And he stole the whole thing.  The

21   whole enchilada was stolen.  And then actually stolen again by

22   the defendant.  After he left the victim company, he continued

23   to get versions of it from an insider.

24              The defendant then -- he left that company in about

25   May of 2014.  Then, in November of 2014, so it's after he

1    left -- and that's according to a document we submitted as

2    Exhibit C to our brief.  It's a PowerPoint for Zettakit.

3                THE COURT:  Well, where does it say that Zetta

4    started after he leaves?

5                MR. ALLEE:  So in the latter part of that document

6    with a Bates page number of 002058.

7                THE COURT:  Okay.  Hang on one second.  Right.  It

8    lists the startup of the company.

9                MR. ALLEE:  Yes.  It lists the chronology for the

10   company.  And it says the company was registered and founded in

11   November of '14.  Elsewhere in that document and in other items

12   we submitted, the defendant has proved to have been a founder

13   of that company.

14               So he leaves the victim company, where he was

15   supposed to have been a trusted employee for about fours years

16   and had been put in a position where he had access to a very,

17   very valuable piece of intellectual property.  He stole that

18   and, within a matter of months, started up a company whose

19   purpose and whose main asset to achieve that purpose is the use

20   of the stolen trade secret to create other new software built

21   upon that.

22               THE COURT:  And were there other products that were

23   also sold by Zetta?

24               MR. ALLEE:  So, your Honor, the defense has pointed

25   out that -- or the defense has asserted that Zettakit sold

1     other products.  Your Honor, I cannot argue to you that that's

2     wrong, and that very well could be so.  It's a bit like proving

3     a negative.  So we're not arguing that all Zettakit's products

4     are specifically derived from the stolen trade secret.

5            What we can argue to you is, if you look at their

6     business model, as they articulate themselves, they, the

7     founders of Zettakit, including the defendant, they didn't make

8     any distinctions like that in their PowerPoint.  When they line

9     up together their list of customers and clients, they don't

10    make any distinctions.  And the two identified customers in

11    this case who, for sure, got products generated from the stolen

12    trade secret, that being the PLA's General Logistics Department

13    and the PRC's Family Planning Commission, for sure got products

14    that came from the stolen trade secret.

15           THE COURT:  And is it fair to say that the

16    intellectual property would support the sale of the products

17    that would be focused on cloud computing?

18           MR. ALLEE:  Yes, your Honor.  Yes.  You can certainly

19    say cloud computing.  And you would say sort of hyper-converted

20    storage.  There's a lot of terms.  Data storage.  Distributed

21    data storage.  There's a lot of terms that, when you hear them,

22    have to do with the products made from the stolen trade secret,

23    but I can't -- your Honor, I'm not asking you to make too much

24    of that fact because cloud computing could mean other things,

25    too.  So all the terms in the PowerPoint are the terms that --

 1   are the type of products that could come from the software, but

 2   that's not necessarily so, your Honor.  Cloud computing can

 3   mean a lot of things.

 4              THE COURT:  And, also, converged computing?

 5              MR. ALLEE:  Right.

 6              So what the product is about is making it so that a

 7   great deal of data can be stored and stored in many places.

 8              THE COURT:  Something called converged storage?

 9              MR. ALLEE:  I'm sorry, your Honor?

10              THE COURT:  Sometimes called converged storage?

11              MR. ALLEE:  Yes, your Honor.  I'm already out of my

12   depth.

13              THE COURT:  Okay.

14              MR. ALLEE:  But, yes, you can call that converged

15   storage.

16              And then there's a lot of value added by facilitating

17   the use of that data together by -- you know, if a company

18   needs to analyze big data or process it, they want to be able

19   to store it in many places and then have the notes where it's

20   stored be able to communicate with each other so it can

21   analyzed.  So there's a lot of terms that flow from that, such

22   as cloud computing, such as distributed data storage, all of

23   which are things that you talk about when you talk about

24   software that comes from this trade secret.  But, your Honor, I

25   can't make too much of that.  It's not definitional.  There

1    could be other ways you could -- a company could be doing cloud

2    computing that could come from other sources.

3            But there's no distinction among the self-professed

4    materials of this company that some products come from anything

5    else, and it is absolutely the shiny object that was held out.

6    You can see it in the meeting with the undercovers.  The value

7    that comes from what Zettakit offers is what was stolen.

8    That's a very important fact.

9            Again, the materials that come from Zettakit itself

10   and from the defendant himself show that Zettakit was not some

11   fly-by-night operation.  It had 30 or more employees.  It had

12   multiple offices.  It had a comprehensive business plan.  It

13   professed to have more than 20 customers, which included the

14   two that I mentioned before.  The defendant himself, in

15   multiple settings, to multiple people, valued Zettakit prior to

16   his arrest in this case -- this goes back a couple years -- at

17   billion 15 million U.S. dollars, or about a hundred million in

18   Chinese currency.

19           By the way, your Honor, that company still exists.

20   Zettakit still exists.

21           There is corroboration for -- sorry.  One other data

22   point there.  Zettakit also commanded capital investments from

23   a noteworthy capital investor, sort of a venture capital-type

24   investor in China.  It was, according to the news reports, a

25   series of investments, the first of which was about two to

1    three million dollars.  And that's something the defendant also

2    referred to during meetings with an undercover officer, the

3    transcript of one meeting we submitted to your Honor.  That's

4    the first part of what happened.

5            Then, of course, the defendant got caught.  And that

6    was in, as I mentioned, an undercover operation that ultimately

7    resulted in the defendant's agreeing to travel to the United

8    States further to that very business aim, further to the aim of

9    making money off of the stolen trade secret.  That, of course,

10   came to nothing because it was undercovers with whom he met and

11   the defendant was arrested at the Ritz-Carlton Hotel here in

12   White Plains.

13           The defendant was asked during meetings with

14   undercovers about many things, including what the victim

15   company might think about all of this, and he answered that

16   question a couple of times and made a couple things clear.  In

17   China, maybe not such a big deal, but he understood, in the

18   U.S., this is a very big deal.

19           THE COURT:  Right.  Not a big deal because just, in

20   China, these rights don't get enforced.  I mean, it's sort of

21   like -- it's not that people don't care, it's just that --

22   maybe not that the victim company wouldn't care, but that, in

23   China anyways, it's just sort of a thing where people don't

24   really look after.  Big fish, small fish.  There was some kind

25   of reference, I thought, to that.

1          MR. ALLEE:  Well, the defendant also said, your

2     Honor, and I think this must be what you're referring to there,

3     that the victim -- he was basically asked what if the victim

4     found out, and he said, well, the victim is a giant.  They have

5     no time to notice all the people, all the companies.

6          THE COURT:  Right.

7          MR. ALLEE:  His answer was not, oh, this won't hurt

8     them, they wouldn't care if they knew about it.  It was I'm not

9     going to get caught, basically that answer, and that has to do

10    with comparative size.

11         THE COURT:  With the knowledge, in the United States,

12    it was different.

13         MR. ALLEE:  Yes.  And it flowed from that

14    acknowledgment.  The thing your Honor said -- that's an

15    inference.  The defendant didn't say why it's not a big deal in

16    China.  There are many inferences as to why he would have

17    thought that, whether that was true.

18         THE COURT:  Yes.

19         MR. ALLEE:  Of course, one thing the defendant did

20    here is benefit the Government of China by stealing the trade

21    secret.  He has pleaded guilty to economic espionage.  His

22    customers, as I noted, included an agency of the Chinese

23    Government, which is the Family Planning Commission.  They also

24    included the Military General Logistics Department.  So the

25    defendant may have had many reasons to think that, in China, no

1    big deal, one of which is he's actually working with the

2    government or assisting them or benefiting them.  Another is

3    maybe there's a cultural norm or a legal norm that this very

4    serious crime in the United States is not as serious or not as

5    likely to lead to accountability in China.  That's what

6    happened.

7          The task for your Honor in this dispute that we have

8    right now is to figure out what the guidelines are.  The

9    standard is a preponderance of the evidence.  It is absolutely

10   the government's burden, as the defense points out.  The issue

11   of loss puts the Court to a task, which is to make a reasonable

12   estimate of loss.  That applies in a trade-secret case like

13   this even where, as the Guidelines Commission figured out in

14   advance, there's not a straightforward calculation like you

15   might find in a defrauding little old ladies of their savings

16   when you can just look at the amount of the savings.

17         THE COURT:  Or like a painting where you can get

18   somebody to say how much it's worth.

19         MR. ALLEE:  Right.  And then you're done.  You've got

20   a reasonable estimate of loss.

21         We acknowledge -- the government acknowledges and you

22   can see the Guidelines Commission kind of acknowledging in the

23   commentary that, in a trade-secret case, the task remains to

24   reasonably estimate loss, but it need not be a perfect

25   estimate.  And to not do that because it's hard or because it's

1    impossible to reach a precise or perfect estimate would create

2    a windfall for the defendant.  So the guidelines are pretty

3    clear you take some -- you look at some factors, you take the

4    data you have, and you make the best reasonable estimate of

5    loss you can provided it's proved by a preponderance of

6    evidence, which all guidelines enhancements must be proved by.

7              So, here, what are those factors and, here, what do

8    we have?  There's a pretty good amount of proof.  We're pretty

9    far past preponderance of the evidence.

10             First, the fair market value of the product.  Well,

11   there's a good start when the defendant himself said, in

12   multiple contexts, Zettakit is worth 15 million bucks.  And we

13   know Zettakit is largely or predominantly -- or at least the

14   value of Zettakit is largely or predominantly the result of the

15   stolen trade secret.  That gives you a big head start in a

16   trade-secret case, that admission by the defendant.  That is a

17   credible admission for reasons we argued in our brief.  Of

18   course, people puff about their investments and about what

19   they're doing, but that was made in many contexts.  I won't

20   repeat everything we said in our brief, but we feel that was a

21   credible estimate by the defendant himself.

22             And as it is a trade-secret case, as your Honor

23   pointed out, there are other factors, which include the

24   development cost to the victim.  The defense pointed to what we

25   submitted about development costs, which we submitted under

1    seal, and so I won't get into specific numbers, which is a

2    matter of sensitivity here, but let me say this.  If the only

3    question that is open -- in other words, if there is an open

4    question at this proceeding as to whether those numbers are

5    sufficiently proved, then we would just ask you to have a

6    Fatico.  We would ask for some other opportunity to firm those

7    up.  There's a sensitivity with those numbers.  Maybe we could

8    figure out a way --

9               THE COURT:  I guess it's more -- having read the

10   Seventh and Tenth Second Circuit cases, especially the Seventh

11   Circuit case, I think more the argument is that, while

12   development costs may, in certain circumstances, be a fair way

13   to calculate intended loss, that it's not so in a case like

14   this.  That's more the argument -- it's more of a legal point

15   than a factual dispute about the accuracy of the numbers that

16   were submitted under seal.

17              MR. ALLEE:  Yes, your Honor.  And we can and should

18   address that and resolve that today.

19              The numbers -- we submitted -- they're in summary.

20   And I concede that there's not all the detail the defense is

21   talking about.  But I am prepared to proffer that the

22   development costs are -- they're actually way, way higher.  If

23   we wanted the approach -- actually, my reading of the Tenth

24   Circuit case, the Snowden case, is that they did plug in those

25   development costs.  The Seventh Circuit, actually, was very

1    critical about that.  I agree with the defense.  That came back

2    on a remand because there was no connection between the

3    development cost and a loss.  The Tenth Circuit I think did

4    plug those numbers in.

5              If we were trying to do that or to ask the Court to

6    translate the development costs into the loss directly, it's

7    actually way higher.  It's way higher than what we are arguing.

8              THE COURT:  Right, but doesn't development costs

9    matter more in a case where the theft results in the dilution

10   of the value of the property?  Because then there's some costs

11   that can't be recovered?  Right?  So, here, to the extent that

12   the proprietary information is still used by the victim

13   company, then their argument is the development costs are not

14   lost here.

15             MR. ALLEE:  Yes, your Honor.  Well, that also gets to

16   the issue -- this is an intended loss.

17             THE COURT:  Right.

18             MR. ALLEE:  So we're not arguing to you an actual

19   real-world loss here.  We're not going to be seeking --

20             THE COURT:  Right.

21             MR. ALLEE:  -- restitution.  This is intended loss.

22   And, yes, as a factual matter, it is an ongoing viable piece of

23   intellectual property that generates products that are still

24   timely and useful and have value.  But that doesn't really --

25   because this is about intended loss and because the guidelines

1    say one of factors you look at is development costs, it is
2    useful to look at that.  The guidelines tell you to do it.  And
3    it is -- maybe it's a proxy or a data point to make an estimate
4    about loss, but it tells you a great deal in this case to know
5    that the victim spent an awful lot of money to develop this.
6    The risk to the victim is very great if the viability of the
7    secrecy, of the trade secret itself, is compromised, because
8    that does compromise the value of the product.  It would lose a
9    competitive advantage if the victim would --

10             THE COURT:  Right.  So you're looking less at what
11   actually happened because of the fortuity of the defendant
12   being arrested and more the intent that he understood that lots
13   and lots of money was spent to develop the platform.

14             MR. ALLEE:  Yes.  And, of course, your Honor, that
15   came up expressly.  It's obvious and it came up expressly
16   during the meetings.

17             THE COURT:  In other words, this is not a case where
18   you're saying the development cost is X and so, therefore,
19   that's the loss amount.

20             MR. ALLEE:  Correct.

21             THE COURT:  That's not what you're doing.

22             MR. ALLEE:  We're not at all.  We discounted -- so I
23   might have come to this later, but now is the right time.

24             The defense says, you know, the government has
25   changed its position.  I don't know whether that's the right

1   way to characterize it.  Of course, what they're saying is, in

2   our Pimentel, we had a higher loss number.  And I will tell

3   you, your Honor, that would be a reasonable argument.  We could

4   stand here and argue to you to translate over the development

5   numbers.  Again, I think that's what happened in the Snowden

6   case.  We're not arguing that to you.  We understand that even

7   the guidelines are not telling the government or the Court to

8   just translate, necessarily, those numbers across and presume

9   that a development cost is an intended loss, but it is a

10  meaningful factor.

11          So, here, the development costs are way north of what

12  we're talking about.  We're asking your Honor to consider that.

13  Imagine two cases, one with a product like this, with this cost

14  of development, and one where there wasn't that, where there

15  wasn't really an ongoing useful product.  Those are two very

16  different cases.  And then factor that in.  And then come back

17  to the defendant's estimate of the value of Zettakit and then

18  the other sort of corroboration for why that estimate is

19  credible.

20          THE COURT:  Well, and I assume you also included the

21  sales numbers as another way of assessing value, that, okay,

22  here's how much money the company has made with products that

23  were supported by the platform.

24          MR. ALLEE:  Yes, your Honor.

25          And there's one specific point the defense made that

1    the sales numbers are more responsive to --

2              THE COURT:  Yes.

3              MR. ALLEE:  -- which is who is to say that the victim

4    would have pursued and benefited from opportunities in China

5    that the defendant was pursuing and, if that's not proved, then

6    there's no loss -- that is another reason why there's no loss,

7    loss is zero.  And our response to that is that's wrong as a

8    factual matter, number one, for reasons your Honor just

9    referred to.  Our point, also -- as well as a factual matter, I

10   should elaborate, because there are ongoing sales of this

11   product.  It is an ongoing viable product all over the world.

12   So, as a factual matter, it is fair to presume that

13   opportunities taken in China would be opportunities -- by the

14   defendant would be opportunities that would have been taken by

15   the victim at some point.

16             Our broader response to that, which is in our brief,

17   is so what.  That's still a loss.  All of the business that

18   could be generated from this trade secret rightfully belongs to

19   the victim.  And so the Court need not decide the likelihood of

20   the victim's pursuing business opportunity X or Y to determine

21   loss.  The Court can and should assume that any business

22   opportunity that could come from this trade secret is a loss to

23   that victim.

24             THE COURT:  Even if the victim company hadn't been

25   selling or tried to sell some product based on proprietary

1    information of company X, whereas, defendant did, it doesn't

2    mean it's reduced to a displacement theory.

3              MR. ALLEE:  Yes, your Honor, yes.  Displacement is

4    exactly right.  It's not that the defendant's arrangement with

5    the Family Planning Commission, and I guess the defendant's

6    claim is that it was a $320,000 arrangement, it's not that it

7    has to be demonstrated that that displaced the gross revenue to

8    the victim, the potential gross revenue, based on its actual

9    list of customers.

10              THE COURT:  Yes.

11              MR. ALLEE:  That was a potential business opportunity

12   merely because it was a customer who was willing to purchase

13   software made from that product.  So that's loss.  And so the

14   sales figures we submitted are further to that point.

15              The version.  Your Honor, just a couple specific

16   responses to what counsel said.

17              THE COURT:  Yes.

18              MR. ALLEE:  And forgive me if I'm repeating, if I

19   already got to this, but I just want to make sure we're clear.

20              Our view is that versions is a red herring.  I

21   remember now we did get to this.  This is product built upon

22   itself.  So you could actually -- we submitted only a limited

23   set of data in our under-seal submission.  I would be prepared

24   to argue -- I would go back 30 years and be willing to make the

25   argument that it's all stolen and it can all be factored into

1    your loss amount, because the versions, that's a complete red

2    herring.  All the versions are built upon each other.  So to

3    steal a later version is to steal an earlier version.

4            And the defense said there's no evidence of intent.

5    They might even say you could accept everything I've just told

6    you, but that doesn't mean the defendant intended all these

7    results, that, as a factual matter, the government has failed

8    to prove the defendant intended that.  Our view is that's just

9    wrong.  That is proved.  You can read the transcript of the

10   meeting.  You can look at the steps the defendant took once he

11   had stolen the product and was engaged in the crimes for which

12   he's to be sentenced.

13           The defendant masked the name of the victim company

14   in the code and the name of the specific product, the former

15   name of the product, so as not to get caught.  That's an action

16   consistent with the notion that you're hurting someone or that

17   to be detected would be a problem because the detector would be

18   aggrieved by it.  That's consistent with an understanding that

19   you're hurting someone, that you would mask what you're doing

20   in that specific way.  As I said, the defendant said -- when he

21   was asked what do you think the victim would think about it, he

22   did not say, oh, I don't think they would care, no biggie, they

23   would be fine with it.  He said they won't notice, I won't get

24   caught.

25           And in addition, your Honor, we submitted a whole

1    bunch of these WeChats.  There were a lot of them.  And forgive

2    us, your Honor, but we thought it was helpful for you to see

3    them.  I would make note of one of them having to do with this

4    argument.

5         There's a series of chats where a colleague of the

6    defendant's is trying to do an installation in deployment of

7    software, and you can see in the chats, it's at page 67 of

8    Exhibit D to our brief, that there's discussion about, uh-oh,

9    somebody from the victim company is here, and the defendant

10   writes, "Try your best not to let that person see you when you

11   deploy the storage."

12        So that, again, that's an action inconsistent with

13   the argument that the defendant thought he wasn't hurting

14   anyone or lacked the intent needed for this enhancement and

15   entirely consistent with his awareness of the obvious, that, to

16   steal something worked on so secretly and carefully for 30

17   years and protected in the way that it was protected, will hurt

18   that company that did that.

19        So that's our position, your Honor.  As I said, we

20   readily concede it's not a perfect estimate.  We came down from

21   our Pimintel.  We think we could argue a higher number.  We

22   didn't want to do that.  We think the defense's arguments would

23   result in a windfall.  And so when we look at those data

24   points, particularly the defendant's own admissions, we think

25   pretty clearly you come out at between nine-and-a-half and

1    twenty-five million.

2            THE COURT:  So how did you arrive at that versus,

3    say, three-and-a-half to nine-and-a-half or twenty-five to

4    sixty-five?

5            MR. ALLEE:  So a big piece is the defendant's own

6    estimate, 15 million.  I'll even say, and I think we said in

7    our brief, maybe he was puffing a little.  Maybe that's not --

8    you know, people exaggerate their own business prospects.  That

9    still clears nine-and-a-half million by quite a bit.  And when

10   you look at the other data points, that's a credible valuation

11   of Zettakit in light of the effort that went into what was

12   stolen, that was taken, that Zettakit used.  So we think the

13   fact that they got capital investments in the millions and

14   there was a series of them, they had actual, real-live clients,

15   institutional clients, we think 15 million is about right.  And

16   even if that's a little exaggerated, it's not so exaggerated

17   that the loss would come below nine-and-a-half million.

18           THE COURT:  Okay.  Thank you, Mr. Allee.

19           MR. ALLEE:  Thank you.

20           THE COURT:  Mr. Diffley.

21           MR. DIFFLEY:  Thank you, your Honor.

22           Briefly, I want to talk about development costs and

23   then talk about market value.

24           THE COURT:  I notice your client is not currently

25   using the services of the interpreter.  Does he just --

1                   MR. DIFFLEY:  I believe he's okay.  I will confirm.

2                   THE COURT:  It's okay with him?  I just want to make

3        sure it is by his own choice.

4                   MS. MAREK:  It is.  He does speak English.  It's

5        difficult sometimes with the speed and then certain legal

6        words, but sometimes it's just too hard for him to listen to

7        her and someone else.

8                   THE COURT:  Fair enough.

9                   MS. MAREK:  So he'll stop me.  He knows to stop me if

10       he doesn't understand.

11                  THE COURT:  Okay.  All right.  Good.  Thank you very

12       much.

13                  Mr. Diffley.

14                  MR. DIFFLEY:  Thank you, your Honor.

15                  Briefly.  We're talking about loss amount.  I want to

16       talk about the issue of development costs and this issue of

17       market value which has come up.

18                  THE COURT:  Right.

19                  MR. DIFFLEY:  As it relates to development costs, it

20       seems to me the situation where that could apply or could come

21       into play is where an employee of company A takes something

22       from company A, starts company B with the goal of shutting down

23       company A and taking their entire market share.  At that point

24       in time, you could say, wow, all their development costs that

25       went into creating this product that he has now taken and is

1    out in the marketplace, you could see how development costs

2    would be measured there.  We don't have that here.

3              THE COURT:  Right, but it wouldn't be the only

4    measure.  Right?  Because it would also be lost profits.

5    Right?  So the intended loss there would be maybe the

6    development costs plus lost sales.

7              MR. DIFFLEY:  Something like that, yes, but it

8    wouldn't just be -- I'm just trying to figure -- I was trying

9    to provide the Court our view on where development costs could

10   be considered.  I'm not excluding other things in that

11   hypothetical.

12             THE COURT:  Right.

13             MR. DIFFLEY:  So, here, we don't have that situation.

14             THE COURT:  But, so, here, to the extent that

15   Mr. Allee, for example, cites page 67 of their Exhibit D, which

16   is these chats, to the extent that even just that one morsel is

17   evidence of your client's intention to make sure that the

18   victim company didn't find out what he did, it's because he

19   understands what he did is something that's against their

20   economic interest.  And he knows that him using their

21   proprietary information could hurt them, which is why they

22   would react in a negative way to finding out.  And that's

23   because there's always the possibility that their proprietary

24   information could be lost.  It would be compromised by virtue

25   of somebody else disclosing it or selling it or using products

1    that are based on that proprietary information and, thus,

2    dilute the value and, therefore, help sink some of the

3    development costs.  Right?  I mean, I don't see why that's -- I

4    mean, the whole point of trade secrets is if other people find

5    out about them, all the setup that made that trade secret

6    valuable could go down the drain.

7            MR. DIFFLEY:  Your Honor, in that situation, the

8    development costs are -- how would I put it?  When you look at

9    the victim company here and the relatively small size of what

10   the defendant did, there's no way to connect that to years and

11   years and years of development costs.  And as the Seventh

12   Circuit said it in the Po case, it's an inappropriate measure,

13   anyway, and it's not a substitute.

14           So, your Honor, that's development costs.

15           The issue of market value, which gets us to that $9.5

16   million threshold, which is based on the revenues that they put

17   together, that, again, while they have provided it, it is our

18   position that they have not met their burden by a preponderance

19   of the evidence to show those revenue costs.  There are issues.

20   It's four bars in a spreadsheet and some commentary.  If you

21   look at it, it includes year 2013.  That was before he started

22   what he did.  It includes all of 2016, while he has been

23   incarcerated.  So even those types of things are the issues

24   that we think just show that that information, at this point in

25   this proceeding, is insufficient.

1                I would, finally, point out that a lot of it, your

2     Honor, is puffery.  Read those chats.  I'm sure the Court has.

3     When you look at the chats, when you look at the conversations

4     with the FBI agents, it's not just puffery.  There's confusion

5     in the language.  Are we talking about U.S. dollars?  Are we

6     talking about Chinese currency?  So that information,

7     similarly, is not enough for the government to meet its burden.

8                So our view is that the government has not met its

9     burden as it relates to the loss amount that they are relying

10    upon in the PSR.

11                Thank you, your Honor.

12                THE COURT:  All right.  Thank you very much.

13                Anything else, Mr. Allee?

14                MR. ALLEE:  No, your Honor.

15                THE COURT:  Okay.

16                All right.  So the battle line is over the question

17    of loss amount.  And, of course, the actual loss is not what

18    the fight is.  It's over the intended loss.  With respect to

19    that, the Court's obligation is to make a reasonable estimate

20    of the loss.  In other words, I don't have to make a precise,

21    mathematically determined calculation of the loss amount.

22                And the loss amount, or the estimated loss amount,

23    can be based on a variety of information that's all spelled out

24    in the commentary already mentioned earlier.  This is (3)(c) to

25    Section 2B1.1.  So among the factors that can be considered

1    include the fair market value of the property unlawfully taken

2    or, if the fair market value isn't practicable to determine or

3    adequately measures the harm, the cost to the victim of

4    replacing the property.  Specifically, in the case of

5    proprietary information, to include trade secrets, the Court

6    can consider the cost of developing that information or the

7    reduction in the value of that information that resulted from

8    the offense.  And then there's a few other factors, the last of

9    which is factor six.  It just says more general factors, such

10   as the scope and duration of the offense and revenues generated

11   by similar operations.

12           So what we have here is a situation where -- it's a

13   case where there's no precise way of saying, okay, defendant

14   stole a painting or defendant reached into the cash register

15   and stole this amount of money.  What we have is the sort of

16   very amorphous concept of intellectual property.  But here's

17   what we know about that intellectual property.  We know, and

18   it's not disputed, how much it costs to develop it.  And it is

19   in eight figures.  I'll put it to you that way.  And I agree

20   that, in terms of what the Seventh Circuit said, that that

21   should not be the dispositive factor, because, in a case like

22   this, it's not as if what was developed has now lost all its

23   value.  And so it's really an imperfect fit for the development

24   costs being the driver here of what the worth is of the

25   intellectual property.  But I also don't agree that it's

1    irrelevant, because if something costs tens of millions of

2    dollars to develop, the notion that the loss amount from the

3    theft of that information should be zero I think is really hard

4    to square, especially in the facts of this case.

5            And I think, really, the development costs is

6    probably the least important factor here, but it's hardly a

7    factor that undercuts the government's estimate, and I don't

8    think it's really Congress, with what it is, that Mr. Xu is

9    arguing in terms of their being a loss amount of zero here.

10           So in terms of looking at the fair market value, even

11   if you put aside the development costs, there's a few other

12   things that we know.  We know that there are millions and

13   millions and millions of dollars of sales not only globally,

14   but even in China, involving products that are supported by the

15   proprietary information.  And that helps give one a sense of

16   the value of the proprietary information.  So to the extent

17   that it supports these products that have taken decades to

18   develop -- that is, that the proprietary information took

19   decades to develop -- and it supports the sales and the dollar

20   amounts that are contained in the government's sealed

21   submission, that's a relevant factor here because it gives you

22   some sense of what the market value is.

23           And then I think there is something to be said for

24   the defendant's own estimate of the market value of the company

25   that's built principally on his attempt to develop products

1    that are based on the proprietary information.  So it's $15

2    million.  The company that he starts soon after he leaves the

3    victim company.  And he engages in a number of efforts to

4    profit from his earlier thievery.  So he continues, through I

5    guess some other hook, to get the latest version of things.  So

6    it's not as if he leaves and then that's it, the thievery

7    stops.  It continues.  And then there are these efforts he

8    makes to, if you will, sort of lift the fingerprints out that

9    identify the proprietary information with the victim company.

10   And there is that chat where he says, you know, don't let the

11   person from the victim company see when you deploy the storage.

12           He gets that what he's doing is valuable to him and

13   that it is something that the victim company very much does not

14   want him or anybody else to take from them.  That's why they

15   went to the lengths that they went to keep the information

16   secret.  And the government lays all this out in its

17   memorandum.  And there's really no dispute about the lengths to

18   which the company went to keep the proprietary information

19   secret, because it understands the immense value that it has,

20   not just because of the sunk costs in development, but in terms

21   of the revenue streams in supporting the products that will be

22   generated from this proprietary information.

23           And Mr. Allee is right.  This sort of

24   different-versions argument doesn't really work because if you

25   get version 9.0, you've got versions 1.0 through 8.0.  And it

1    may be that, 20 years from now, it will become obsolete, but

2    looking at it in terms of the net-present value of the income

3    stream from now to 20 years from now, it's a number that I

4    think the defendant would be quite displeased with.

5            So where I come out on this is that, whether you look

6    at the revenue streams from the products supported by the

7    proprietary information or you look at what the defendant is

8    saying himself about the value of his company that's largely

9    propped up by products he's going to sell based on the

10   proprietary information and then you do look at the development

11   costs, even though it's not a dispositive factor, certainly,

12   that number is not inconsistent with the millions and millions

13   of dollars that the defendant thinks that this stuff is worth

14   and that the market said it was worth by virtue of the sales

15   that the company was able to achieve off of products supported

16   by the proprietary information.

17           And I don't think the government is required to, in

18   this circumstance, show displacement of customers.  As

19   Mr. Allee says, it was the company's right to sell these

20   products to the government agencies the defendant sold to or

21   any other private company.  And the company clearly was trying

22   to -- the victim company was trying to market its products in

23   China, as is evidenced by the government's submission.

24           So in terms of the defendant's intent, he stole the

25   proprietary information with the intent to profit by selling

1    products that would be supported by the proprietary

2    information.  He went to great lengths to make sure he didn't

3    get caught.  He went to great lengths to see to it that there

4    would be no way to tie his copy of the information to the

5    victim company.  And he went to lengths to try to stay as

6    current as he could on the development of the proprietary

7    information, knowing its value, as manifested in his own

8    projections as to the company Zetta's value.  So, all right, so

9    maybe that's puffery.  So then we discount it.  And then maybe

10   I guess the question is how much.

11           My view is that I think the government does have the

12   better of the argument that would support an intended loss

13   amount of between nine-and-a-half and twenty-five million

14   dollars.  But even if one discounts the $15 million valuation

15   and takes off 70 percent of it, it still comfortably fits

16   within the loss amount that's one level below, the

17   three-and-a-half to nine-and-a-half million dollars.

18           So the Court's finding is that, by more than a

19   preponderance of the evidence, the government has met its

20   burden of establishing that the intended loss amount was

21   between three-and-a-half and nine and half million dollars.  As

22   I said, the combination of the defendant's own valuation of his

23   company, based largely on the use of or the sales of products

24   supported by the proprietary information, the sales numbers

25   from the victim company, the development costs, and all the

1   lengths the defendant went to to basically guard his own new

2   trade secret, the one he stole from the victim company.  And so

3   I think that, therefore, it is appropriate to add 18 levels to

4   the base offense level.

5           All right.  So that's the only issue that's in

6   dispute, as I understand it.  Right?

7           MR. ALLEE:  Well, the defense, in their initial

8   submission, disputed another guidelines issue, which is the

9   enhancement for abuse of a position of private trust.  In our

10  response, we noted that there are two prongs to that

11  enhancement, the special skill, and the defense has not taken a

12  position on that.

13          MS. MAREK:  Yes, your Honor, we did dispute, in the

14  initial PSR, that it was based on abuse of a position of trust,

15  and we felt like he was the lowest-level engineer at the

16  company, that he wasn't given any greater access than anyone

17  else.  They have brought up the special skill.  He was a

18  trained engineer.  I mean, I think we would still make an

19  argument that he doesn't have much more of a special skill than

20  anyone working at the victim company besides maybe janitorial

21  or secretarial staff, but we won't make a big fuss out of it.

22          THE COURT:  Yes.  I think the special skill -- I

23  understand sort of where in the hierarchy the person fits

24  argument, but the special skill argument it seems to me is a

25  good fit here.  It may be that he didn't have a fancy title,

1    but he had a fancy set of skills and experience and training,

2    and only somebody with those skills would have access to this

3    information that the victim company went to great lengths to

4    try to keep secure.  I mean, you know, it's almost like saying,

5    well, you know, the low person on the Manhattan Project was

6    only a nuclear physicist, but they weren't like the director of

7    the project.  They still had a special skill, and they couldn't

8    go tell the Germans and the Japanese, hey, we're building a

9    nuclear bomb.  And so, here, the victim company said you have

10   to have a special skill and we are entrusting to you and we are

11   enforcing by making you sign things and engage in these sort of

12   protective measures, and he took advantage of that.

13           I would not be able to steal that information because

14   I wouldn't even know how to turn on the computer, probably.  So

15   I think the special skill thing I think has a lot of force.  If

16   you want to press it, I'm all ears.

17           MS. MAREK:  We don't, and that's why we didn't raise

18   it earlier.

19           THE COURT:  Okay.

20           MS. MAREK:  We took the issue with the abuse of

21   position of trust, but we understand where the Court can find

22   special skill.

23           THE COURT:  Okay.  All right.  Fair enough.

24           So I think, then, we should then pivot to the 3553(a)

25   factors.

1              Ms. Marek, are you going to cover those?

2              MS. MAREK:  Yes.

3              THE COURT:  Okay.

4              MS. MAREK:  And can I just be clear that we've, I

5       guess, calculated a level 29 as the total offense level.

6              THE COURT:  Yes.

7              MS. MAREK:  Which I believe 87 to 108 months will be

8       the guidelines range.

9              THE COURT:  Correct.

10             MS. MAREK:  Okay.  Great.

11             So now that we have that final guidelines

12      calculation, I want to explain why we believe a

13      below-guidelines sentence is appropriate in this case and why

14      we are asking for time served, which is a little over 25

15      months, why we think that's the correct sentence based on the

16      3553 factors.

17             I know that you have a wide range of recommended

18      sentences from the defense, the government and then Probation,

19      and we feel like the government's taken an aggressive position

20      by arguing for what was the 108-to-135-month guideline range.

21      Probation came in much lower, recommending a 48-month sentence,

22      and we're arguing for time served, which is a little over 25

23      months.  We think that 48 months should be considered the high

24      end of what is applicable to Mr. Xu, which is where Probation

25      came at, and we think that a sentence, really, of time served

1    adequately punishes him for his crime, but also allows him --

2    he is a young man -- to have another shot to really make a

3    second chance in life.

4           So the first factor I'll discuss is the nature and

5    circumstances of the offense and history and characteristics of

6    the defendant.

7           Mr. Xu admits to stealing the source code from his

8    former employer and using that code in his new business

9    venture.  He entered a guilty plea without the benefit of a

10   plea agreement after those negotiations fell apart, and he

11   admits that he did that.  He understands it was a serious

12   crime, and he accepts that, and he accepts full responsibility

13   for his actions.  And he will address the Court at the

14   conclusion.  He would like to speak.

15           THE COURT:  Okay.

16           MS. MAREK:  You know, I mentioned he was a low-level

17   employee at IBM working really to sort of fix, he calls it

18   bugs, you know, issues that came up in the source code.  This

19   was his first job after he got out of graduate school.  He

20   worked there for a few years.  He always remained what they

21   called a band-six engineer, which is the lowest level.  And

22   when he left the job, he took the source code with him, you

23   know, sort of the first, if you'll ask him, ill-fated decision

24   that led him here today.

25           He went to a startup company, where he worked for

1    about one year.  And he did not use the source code at this

2    first startup company where he worked.

3              He left that startup company and went to another one

4    called Zettakit.  That is at issue here.  And there, with

5    others in the company, he eventually did use the source code to

6    create this software marketed and sold by the company.  And

7    this was really that second ill-fated decision, and I know it's

8    one he wishes that he could take back.

9              We raised this point in our sentencing submission,

10   but I want to reiterate that Mr. Xu did not ever sell the

11   source code.  I know the government makes a point that that

12   maybe doesn't matter, but it matters to us.  He never sold it

13   to anyone in China.  He never sold it to the undercover agents

14   when that seemed to be really what they were after during the

15   meetings.  He didn't just take the code, as you see in some of

16   these other economic espionage cases, and go out and sell it to

17   the highest bidder.  What he did was certainly wrong and

18   unacceptable, but he did sell I guess a software program that

19   at least is it already public.  It's out there.  It's what the

20   victim company sells to the this day.  He did not take the code

21   and sell it to others.

22             He used the code, and the purpose of taking it -- and

23   this is somewhat commonplace, from what I understand, in

24   China -- to get the startup off the ground so that they can

25   then work to code their own other projects, whether they relate

1    to storage, cloud computing.  And that was what he had seen

2    other individuals in other companies do.  Obviously, that

3    doesn't make it right or legal.  It just explains a little bit

4    behind the motivation of using someone else's work product

5    source code to establish this company so that they can then

6    have the means and ability to start a new code from scratch or

7    use various open source.  There's lots of open-source programs

8    that have interesting names like Sheepdog that do the same

9    thing or a similar product that GPFS provides.

10           But Mr. Xu did not sell the code.  And he knows

11   others who have taken GPFS or other source codes in China.  It

12   is something, I guess, that there's just not a real cultural

13   respect for intellectual property that at least he experienced

14   there.

15           And when he was here meeting with the undercover

16   agents, he did talk about what he had used in China to make the

17   software, but he did suggest here that the undercover agents

18   buy a license and that then he could maybe use that to help

19   them kind of hack the license, spread it to more computers.

20           And I only mention that just so your Honor has an

21   understanding of the facts and maybe his motivations behind

22   doing this.  It's not meant to excuse the conduct that he knows

23   is wrong and is illegal.

24           And he accepts responsibility for his actions.  He's

25   entered the plea.  He's gone in for a proffer session with the

1    government.  It didn't yield to anything where we're talking

2    about cooperation here, but, you know, he did go in and meet

3    with them for about a half a day and provided, I think the

4    government would agree, very honest and truthful statements to

5    them.  And he's extremely remorseful for his actions and

6    particularly the pain and suffering that they've caused his

7    family.

8            And I want to talk a little bit about his background

9    and family.  As the Court knows, he was born and raised in

10   China.  He spent a few years in the U.S. studying at the

11   University of Delaware.  And he was living in China at the time

12   of his arrest.  And he came over here for what he thought was a

13   meeting for a job interview.

14           Mr. Xu is an only child.  His parents and fiancee are

15   still in China.  He's been incarcerated here for 25 months

16   while his family has been more than 7,000 miles away.  Not

17   being able to see his family for more than two years has been

18   very burdensome to Mr. Xu, but what causes him more pain and

19   regret is what his family's been through because of his

20   choices.  As I'm sure your Honor has seen in other cases, it's

21   often the families of the defendants who suffer the most for

22   their actions, through no fault of their own, for the

23   defendant's actions, and that's the situation that we see here

24   with Mr. Xu's family.

25           His parents, obviously, miss their only child and are

1   really struggling to understand what's going on, the situation

2   he's in.   I think you can kind of see that maybe from their

3   letters.   And I hope you excuse the translation of how certain

4   words are used in China versus how it translates over here.

5           THE COURT:   No, I thought the letters were quite

6   compelling.

7           MS. MAREK:   His father's health has been declining

8   for a while and now is really failing.   His father wants the

9   chance to see his son again before it's too late, and I know

10  Mr. Xu desperately wants the same.

11          Mr. Xu and his fiancee were supposed to be married in

12  the spring of 2016, and she's now seeing their wedding day come

13  and go and has also not seen her fiance in over two years.

14          I actually had the opportunity to meet Mr. Xu's

15  fiancee.   I was in China on a related -- another case and she

16  met us with one of our attorneys there for dinner and was very

17  thankful for us taking on the case.   It was sort of a --

18  Mr. Xu's parents actually found one of our lawyers in China

19  when we first opened a small Beijing office, and they couldn't

20  afford counsel and asked if -- they had seen publicity of

21  another economic espionage case we had and had asked for help.

22  And so it was a very unique way to get a case in China, and

23  it's sort of why you have lawyers from Atlanta taking this one

24  here.   But I've met her, and I'm impressed by her continued

25  support of -- she had no idea he had done any of this and then,

1    one day, you know, got a call and found out he had been

2    arrested, had to explain it to the family.

3           And even if Mr. Xu's allowed to return home to China,

4    you know, tomorrow, he'll never get over this pain that he's

5    caused his family.  And I also know that many defendants

6    probably come before your Honor with similar family

7    circumstances of a dying parent or maybe children they need to

8    take care of, and that doesn't necessarily entitle them to a

9    more lenient sentence than a defendant who doesn't have that

10   background, but I really stress the issue here because I think

11   it just -- is a unique circumstance with his family being in

12   China.  You know, they're not able to come here due to health

13   issues, financial reasons, to visit him.

14          And I also stress his family situation because I

15   think it's really impacted the punishment that he's felt these

16   last two years being here.  I think it should be considered in

17   sort of the severity of the punishment he's already faced.  You

18   know, he knows he's the sole cause of this suffering that his

19   family is facing here, and he wants a chance to return home and

20   see his father, marry his fiancee and sort of make things right

21   to the family and to regain their trust.

22          Moving on from there to the deterrence factors, I

23   have no doubt representing to you that Mr. Xu would never

24   commit another crime in his life.  He's never been in trouble

25   with the law before in China or the short period of time he

1    lived in the U.S.  And he's learned a serious lesson about the

2    consequences of your decisions and your actions by being here.

3    And I feel confident saying it's a lesson he will never forget.

4          To the issue of general deterrence that I think the

5    government stresses in their brief, I know the government I

6    believe wants to send a message with what I think is an

7    extremely high sentence for general deterrence purposes, and I

8    don't think that a lengthy prison sentence is necessary to

9    achieve that deterrence.  Anyone paying attention to this case,

10   particularly anyone in China, where the government seems to

11   direct some of its concern for deterrence purposes, understands

12   that Mr. Xu's life has really been shattered by these actions.

13   They know that, when he returns to China, he's going to face

14   questions about why he entered a guilty plea to economic

15   espionage involving the Chinese Government.  That was a risk he

16   knew when he took this plea.  They know that he'll likely be

17   unable to get a job with any sort of American or European

18   company in China due to this conviction.  And, more

19   importantly, people will know that he spent two years here in

20   an American prison away from his family.  And I don't think

21   that keeping him in prison for another two or four or even

22   eight years would have any greater deterrent effect than what's

23   already been achieved by him serving these 25 months in

24   custody.

25          The final 3553 factor I wanted to discuss is the need

1    to avoid unwarranted sentencing disparities in comparison with

2    similarly situated defendants.  While this isn't a case where

3    Mr. Xu has co-defendants accused of the same conduct to compare

4    him to, it is a unique statute where the people who have been

5    convicted under this have stolen trade secrets or committed

6    economic espionage, and a lot of them follow the same factual

7    circumstances that Mr. Xu has faced.  And his conduct is

8    similar to many of these defendants that were sentenced.

9              We included, with our first submission, a chart and

10   then a brief summary of the 133 cases that we were able to find

11   publicly that had either led to a conviction at trial or a

12   guilty plea and had a sentence in an 1831 or 1832 charge.  And

13   I know that summaries can't give the Court the same level of

14   knowledge about those cases as Mr. Xu's case, but I hope it at

15   least allows the Court to see some similarities between his

16   case and the majority of other EEA cases that have proceeded to

17   sentencing.

18             And we really find the data to be overwhelming.  110

19   of those 133 or 82 percent of all defendants sentenced for

20   crimes under the EEA received a sentence ranging from Probation

21   to 24 months custody.  And Mr. Xu's already met that.  He's at

22   25 months.  That puts him in the overwhelming majority of other

23   defendants who have committed similar crimes.  And we think his

24   conduct places them squarely in that 82 percent majority.

25             I know the Court has the submissions with our

1    information.  I just flipped through it again last night to

2    pick a couple cases to highlight.

3              There was one out of the Western District of

4    Washington, U.S. v. Kibkalo.  It involved a defendant working

5    at Microsoft.  He accessed Microsoft trade secrets, including

6    new software updates for Windows 8 that hadn't been released

7    and a software development kit, and then he sent that

8    information to someone in France to use for his own benefit.

9    The loss amount was extremely high, between 10 and 30 million

10   in that case, and the defendant was sentenced to three months

11   in prison.

12             Another one that just jumped out as being similar to

13   me is U.S. v. Wang from the Northern District of California.

14   That defendant was the head of engineering at his company.

15   They were developing a memory chip for computers.  And he used

16   his position to transfer proprietary information from that

17   company to his personal computer.  He left his job.  He started

18   his own company, a startup, and then he traveled to China with

19   that information from his former employer.  And he was

20   sentenced to six months in prison.

21             So I just highlighted as those are two in the 82

22   percent that received under 24 months custody.

23             The only other specific cases I'll discuss are the

24   two out of the 133 where the defendant was sentenced above the

25   range that the government seeks for Mr. Xu.  And these two

1  defendants were both convicted at trial.  They were both agents

2  of the Chinese Government, one an actual spy who worked at

3  Boeing for 25 years stealing highly sensitively military trade

4  secrets.  I know the government raises that Mr. Xu may have had

5  business with military agencies in China, but this is not a

6  case of weapons technology or military trade secrets.  This is

7  data storage that gets sold to many different companies, and

8  the military has data like anyone else, so I don't think you

9  can really use that to compare to some of these cases where the

10  defendants received a very high sentence.  I think this case is

11  very different from those.  He didn't act at the direction of

12  the Chinese Government like these defendants did.  He ended up

13  having the Chinese Government as a client later.  As the Court

14  may know, it's difficult to find a lot of companies in the PRC

15  that are not connected to the PRC just due to the structure

16  there.  But, instead, what he did is, like those other

17  defendants in the two cases I mentioned, he stole a trade

18  secret from his employer, and he used that for his own benefit.

19         After a review of all of the EEA cases and a lot of

20  time on PACER, we really believe that there is a risk, when you

21  look at the 82 percent of defendants sentenced to under 24

22  months, of an unwarranted sentencing disparity if Mr. Xu is

23  sentenced in excess of that.

24         So I wrap this up, your Honor, by asking that you do

25  sentence Mr. Xu below the guidelines range.  We recommend a

1    sentence of time served.  It's, obviously, your Honor's

2    discretion.

3            He knows he made a huge mistake, and he regrets that

4    every single day.  And he has had a lot of time to think about

5    those choices.  He doesn't have family.  I'm his only visitor,

6    with Mr. Diffley or Mr. Brown.  We're in Atlanta, so we're not

7    up here often.  He's had nothing but time to think about what

8    he's done.

9            He's a young man.  He's now I believe 32 years old.

10   Like I said, this was his first job where he did this.  And he

11   knows he can't erase the pain that he's caused his family.  I

12   think they've been very supportive, and I think they should get

13   credit for that, and I wish that they could be here to show

14   that support to the Court, but I think he still has to regain

15   their trust.  I mean, I think it's going to be hard for him to

16   go back.  It's really changed their life and his life.  And I

17   think, if he's allowed to return home -- and I know he'll speak

18   to this a little bit -- he will start his life over.  He will

19   live a life that is crime free.  I think he has no interest in

20   going back to any sort of computing engineering.  I think he

21   wants to just start fresh.  He's lived every day with this

22   regret and remorse, and I think that punishment is sufficient

23   to serve the principles that underlie the sentencing process.

24           And so we just ask the Court to give Mr. Xu a chance

25   to return home to China soon to see his father, to get married,

1   if his fiancee will still have him -- I think she will -- and

2   to kind of get a shot at a do-over, at rebuilding his life as

3   soon as possible.

4           THE COURT:  All right.  Thank you very much,

5   Ms. Marek.

6           MS. MAREK:  Thank you.

7           THE COURT:  Mr. Allee.

8           MR. ALLEE:  Thank you, your Honor.

9           The guidelines that result from the range that arises

10  from your Honor's earlier ruling are 87 to 108 months

11  imprisonment, which is just over seven years to nine years, and

12  our position remains, as it was when it was a higher range that

13  we argued, that that would be a sentence that would be

14  reasonable, fair and appropriate based on the circumstances.

15          About the history and characteristics of the

16  defendant.  I have no response to what the defense has said.

17  They've done a good and thorough job describing those.  Your

18  Honor should consider that.  The defendant was a computer

19  programmer and a software engineer and committed the crime in

20  that capacity, and we know of nothing else about his personal

21  circumstances that I would submit in response.

22          We do think, as the defense pointed out, other

23  sentencing factors are of very heightened importance here, the

24  nature and circumstances of the offense, the need for general

25  deterrence to deter other people who are considering like

1    conduct from pursuing that conduct, the need to promote respect

2    for the law, and the need for just punishment among them.   I'll

3    also address the defense's point about the need to avoid

4    unwarranted sentencing disparities.

5          The defendant is to be sentenced by your Honor for

6    two crimes.   They came in six counts, but it's two crimes.

7    It's the theft of trade secrets, which, here, is a trade

8    secret, and economic espionage, which, here, was the theft of a

9    trade secret with the intent to and in order to benefit a

10   foreign government, which is, here, the Government of China.

11         These are extraordinarily serious crimes.   They

12   result partly just themselves, the crimes themselves, in

13   significant penalties, even without enhancements, and the

14   reason for that -- there are many reasons for that, but they

15   include just the types of things that the defendant was doing.

16   This is, in some ways, a quintessential economic espionage and

17   theft of trade secrets case.   And when you read some of the

18   literature about the origins of the statute, you can imagine

19   that they were thinking of precisely this conduct -- they,

20   Congress -- when they made this a crime, because here's what

21   the defendant did.

22         This was not an isolated misjudgment by someone who

23   was careless with a valuable piece of intellectual property.

24   This was a defendant who had worked for four years at the

25   victim company in the unit, in the division and the department

1    where this product was maintained and worked on and developed.

2    You can imagine that is a matter of serious importance to the

3    victim company that would not be lost on the defendant.  And it

4    is a serious -- we can argue about private trust, abuse of

5    private trust, and the guidelines.  And that became moot

6    because of the special skill.  Forget about the guidelines.

7    This is a serious breach of trust.

8            Imagine you get out of school.  You work at your

9    first employer for four years.  You work on something, one

10   whole point of which is to keep it secret while you're working

11   on it, and then you leave and steal it and try to make money on

12   it.  That is a serious crime.  That is a serious problem.  And

13   then it is in this house that lives in this world of economic

14   espionage and theft of trade secrets because it is a very

15   valuable piece of intellectual property.  It is something that

16   the victim company worked on for years.

17           The victim company here, as we've described before,

18   spent over 30 years on this product.  That was a matter of

19   great financial risk to that company.  It was an investment

20   that could have gone in all kinds of directions and led to

21   losses and didn't because of the ingenuity and the efforts, the

22   savvy and the technological competence and success of that

23   company.  All of that's at risk.   Those are all matters that

24   the defendant took into his own hands when he stole this.

25           And it's fine that he didn't purposely give it to

1    someone else, by his own account, it being the trade secret,

2    but he put that all at risk, anyway, first before his own use

3    of it, of course, his intentional use of it, and, second, he

4    didn't take all the precautions that the victim company took.

5    He took that 30 years of work and financial risk and put the

6    victim company in a position where they had to rely on him, a

7    guy getting on a flight to go halfway around the world with it

8    in his laptop bag and his security protocols, which were none,

9    in order to have any confidence that that substantial

10   investment would continue to bear fruit.

11           As I mentioned, it was not an isolated misjudgment.

12   It was also not otherwise isolated.  This was a crime that took

13   place over the course of years.  We talked earlier the

14   defendant left in May of '14.  He starts Zettakit with three

15   other founders in November of '14, a company whose purpose is

16   to profit from this product.  He continues in efforts, as we

17   described, which yields customers in China and then, therefore

18   and further, for over a year, engages in the efforts with the

19   undercovers, which we, obviously, know a whole lot about, where

20   the defendant pursued what he thought was a business

21   opportunity to, again, profit from what he stole.  And in

22   furtherance of that, it wasn't merely a passive effort.  It

23   wasn't the defendant acceding to propositions by undercovers.

24   It was the defendant reaching out.  It was the defendant making

25   suggestions.  It was the defendant traveling around the world

1    in pursuit of that effort.  So this took place over years, over

2    continents.  This was a thorough-going crime.

3           The economic espionage piece of it, one other serious

4    aspect of it, which is plain just from saying it, the customers

5    here, they aren't just any customers.  This was the General

6    Logistics Department of the Military of the Chinese Government.

7    The defense is correct.  We have no quarrel with the point that

8    the defendant is different from the defendant from Boeing.  The

9    defendant wasn't taking some military weapon and disseminating

10   it, or technology about a military weapon.  So that's fine.  We

11   don't want there to be a misunderstanding by your Honor.  There

12   are all kinds of uses for these products.  There are all kinds

13   of ways that an adversary might benefit from having access to

14   products generated by the software.  So hopefully that point is

15   not overplayed or misunderstood by the Court as meaning more

16   than what was said by counsel.

17          We said more in our brief about that.  I'm not going

18   to elaborate more about the nature and circumstances of the

19   offense.  I'll also talk about general deterrence and the other

20   items, but not belabor them.  I know your Honor understands

21   them, and we wrote about them in the brief.

22          General deterrence.  It is an important factor here.

23   There is a need to send a message with this sentence.  A

24   time-served sentence, in our view, while it would have all the

25   consequences defense counsel described that are negative for

1    the defendant, he's already gone through two years in prison,

2    that would actually send the opposite message.  I mean, you

3    could rationally commit this crime knowing you're going to

4    go -- even if you knew you were going to get caught, that you

5    would go to prison for a couple years and then commit it.  I

6    mean, that's, obviously, such a light sentence that not only

7    would it fail to generally deter, but might backwardly

8    incentivize this conduct.  And a couple things about it.

9            It's hard to improve upon what was said in the

10   history of the statute that the defendant violated.  Certainly,

11   at least by me, it's hard to improve on that, so I'll just

12   repeat what was said.  "Economic espionage and trade secret

13   theft threaten our nation's national security and economic

14   well-being."  That was a statement of the President when he

15   signed the legislation that criminalized the defendant's

16   conduct.  That continues today.  A study just this year that we

17   cited in our brief from an expert committee described that the

18   theft of IP "remains a grave threat to the United States."

19           This is a very live issue.  There is a very real need

20   to deter it by catching and prosecuting those who commit this

21   crime and then imposing on them serious punishments that will

22   make other people think very, very hard before engaging in the

23   same kind of conduct.  And it's true that the need for that and

24   the related need of a sentence to promote respect for the law

25   is heightened because this involves a defendant who is a

1  Chinese National and who committed this conduct or engaged in

2  this conduct and who was then convicted of conduct that was

3  undertaken with the intent to benefit the Chinese Government

4  and agencies thereof.  That is a real problem.

5  It has been offered to you, your Honor, today, in

6  this proceeding, in mitigation, that there is not a cultural

7  respect for IP in China.  That has just been said to you today.

8  That is an ongoing, live problem.  Now, in a sense, that is

9  mitigating because maybe it explains why the defendant did

10  this, although he did not do it casually and, as we already

11  argued about, he was well aware of this being so criminal and

12  problematic for the victim company in the United States.  But

13  it does seem to be the case, just based on what we all read in

14  the papers and the fact of sort of the sentencing, that there

15  is a lack of a cultural respect for IP in China.  That is

16  completely unacceptable.  If there is a cultural norm that it

17  is okay to steal decades-long IP, IP that took decades to make

18  in the U.S. at great risk, that needs to be met with criminal

19  sentences of imprisonment.  That is one way to address that, to

20  send a message that, no, whatever your cultural norm is, it is

21  completely unacceptable to steal United States intellectual

22  property and technology for your own personal profit or for the

23  benefit of a foreign government.

24  So that is a fair consideration here.  It's not the

25  only one.  It has to be factored in with the rest, including

1    the defendant's own unique considerations.  But this sentence

2    should and must send a message that will demonstrate to anyone

3    in China looking at the victim company, or anyone else, that

4    you cannot steal this technology and go to prison for a couple

5    years.  You will go to prison for a very long time for that.

6    You need to think very hard about whether that is in your own

7    interest irrespective of whether there is a cultural acceptance

8    of that in China.

9              On unwarranted sentencing disparities, first I'll

10   just make a nod of the excellent job done by the defense in

11   putting together those cases.  Some of that is done, actually,

12   by the Department of Justice as well.  We've looked at a lot of

13   those cases.  There's a couple problems with that argument by

14   the defense.  While they're correct that there are many

15   sentences that are relatively short for this crime, there's no

16   effort made by the defendant and the contrary is clear that

17   those cases often did not involve economic espionage.  And what

18   I mean to say is there's no effort made by the defense to show

19   that there's an apples-to-apples comparison.

20             And so many of those cases, a hundred plus, are not

21   economic espionage cases.  They do not involve defendants who

22   acted to benefit foreign governments.  They also, if you look

23   at them one by one, and we looked at as many as we could,

24   involved defendants whose efforts ranged from silly and

25   unlikely ever to possibly succeed to plausible, but,

nevertheless, completely inchoate.  There are people who said

something to a co-worker and then a sting happened.  There are

people who tried to walk out the door through a -- passed a

security guard with something and got caught with something in

a briefcase.  So one reason why they're not an apples-to-apples

comparison is this defendant got so much further and engaged in

so much more thorough and successful conduct than did many,

many of those defendants.  And the defendant, while certainly

we're not here arguing he was a spy for the Chinese Government,

he is distinguished from many of those defendants because he's

convicted of economic espionage, which means he acted with an

intent to benefit a foreign government.

          Also, in any case, this sentence would not be an

outlier.  Maybe it's higher than other sentences for defendants

whose conduct is not as serious, but, a guidelines sentence

here is not an outlier.  There's the Aleynikov case.  Now, that

was, obviously, reversed by the Circuit.  There was a whole

issue with that.  That did not have to do with the sentencing.

Judge Cote went through a lot of this analysis.  No loss.  Big,

big victim that's a big boy and can deal in a world of theft,

you know, in a similar sort of dynamic there, and Judge Cote

imposed a sentence of 97 months.  That was not an unreasonable

sentence.  There are other sentences that are comparable to the

guidelines here.  A sentence within the guidelines would

comfortably fit within the sentencings upon comparable

1    defendants to the extent you can figure that out and try to

2    make an apples-to-apples comparison.

3            Your Honor, I'm not going to go back through what we

4    quoted about the efforts by the defendant to hide from the

5    victim what he was doing, but I just want to make one last

6    reference to that.  That's an important factor here.  The

7    defendant throughout cannot claim ignorance, cannot claim that

8    he was pursuing some conduct under the notion of no harm, no

9    foul.  He was well aware of what he was doing.  He tried to

10   hide it.  He has pleaded guilty for it.  He needs to be held to

11   account.  A guidelines sentence would be a reasonable and fair

12   sentence to hold him accountable for his conduct.

13           Thank you.

14           THE COURT:  Thank you, Mr. Allee.

15           Anything else before we continue?

16           MS. MAREK:  Can I make a few points on the disparity

17   argument or have you heard enough?

18           THE COURT:  Look, I've read the papers, but I would

19   never tell a lawyer to be silent.

20           MS. MAREK:  Just a couple comments on that based on

21   sort of the apples-to-apples comparison.

22           We did highlight the EEA cases so that you could see

23   which ones were actually espionage charges.  There's only a

24   handful, but I will note that three of those defendants were in

25   the 82 percent range that we argue for.  And we do agree with

1    sort of what they said about it being a quintessential EEA

2    case, and I think that is why we find the disparity argument so

3    powerful, because many of those were very similar and what we

4    would consider a quintessential EEA case.  It's the other 18

5    percent, I think, where there's much more egregious conduct

6    that's not at issue here.

7           And just to address briefly the general deterrence.

8    I don't think someone's going to be backwardly incentivized to

9    say I'm only going to get two or three, maybe four years, I'm

10   going to take this risk.  I don't necessarily think that

11   someone's going to process something like that versus a much

12   higher sentence when they think about I'm going to go and

13   commit this crime.

14          And what they closed with, you know, we don't argue

15   that the reason he did this, that he didn't try to remarket it

16   and change the name.  I mean, that's part of why he changed the

17   name, of course, because he took it to another company.  It

18   wasn't all in this effort to hide.  He's not going to go out

19   and try to market something that has the same name as another

20   company.  It's not meant to be an excuse.  He does accept that

21   what he did was wrong.  But I do think it would be sort of

22   unduly harsh and unwarranted to make this example out of him

23   when his conduct has not, I believe, reached the level that

24   should be in the new guidelines range of a sentence.

25          THE COURT:  Okay.  Thank you very much, Ms. Marek.

1          MS. MAREK:  And Mr. Xu would like to address the
2     Court.

3          THE COURT:  Sure.  I was about to invite him.

4          MS. MAREK:  And he is going to speak in English, but
5     if you have trouble understanding him, we can get the
6     interrupter or have him repeat something.

7          THE COURT:  Okay.  All right.  Thank you.

8          Mr. Xu.

9          THE DEFENDANT:  Your Honor, Judge Karas, I am very
10     thankful for this chance to speak in front of you.  First, I
11     want to take this chance to apologize to God, the Court of
12     United States and my former employer company for my wrong
13     actions.  I am very sorry and remorseful for my mistake which
14     landed me where I am now.  My former employer spent its
15     resources and efforts to train me to be a better engineer.  I
16     am very shameful for what I have done.

17          I have been in jail for over two years.  This painful
18     experience has taught me a life lesson.  I cannot remember how
19     many nights I weep into sleep.  I am not as fortunate as other
20     inmates who could have family visits every week.  I miss my
21     family far away in China.  I feel so regretful for the mistake
22     I made which destroyed their very life and put them into great
23     pain.  I could never forget the hardship my parents went
24     through to raise me up and support me to finish my college.  I
25     always want to try my best to help my parents suffer less from

sickness and have a better life when they are old.  The fact

that my family could not afford the expense of my father's

liver transplant always makes me feel very sad.  After I was

arrested, the situation of my father's cancer has gone worse.

My mom did not want me to know this until I found it out from

my lawyer.  I still remember the first time I call her from

jail and she was crying so much that she could not talk.  I am

her only child.  Now she, still recovering from her tumor

surgery, has to take care of my father, grandpa, and also deal

with my situation in jail.  She and my fiancee are now

suffering from deep depression.  I wish I could do anything to

take their pain away.

          I understand now God has his plan for me and my

family.  My father told me that I need to focus on God's word

every day and he is waiting for me back home.  My whole family

and my aunt's church are praying for me.  I want to bring

people God's word after I am released and use my own testimony

to show God's almighty love.

          Most importantly, I hereby promise in front of God

and the Court of United States that I would never do any harm

to any intellectual property again, and I want to use my own

life experience in jail as a willing example to promote

awareness and respect of the intellectual property protection

in China to remedy the wrong actions I committed because of the

lesson I learned during these two years.

1           Lastly, I want to express my thanks to my lawyers.  I

2    have no family here.  They spent their precious hours to help

3    me for my family issues and relay my situation in jail to my

4    family.

5           I know right now nothing I could do to get back my

6    family's health.  I hope I have a chance to see my father again

7    when he is still alive.

8           In Bible, Jeremiah, Chapter 29, says, "For I know the

9    plans I have for you, plans to prosper you and not to harm you.

10   Plans to give you hope and a future.  Then you will call me and

11   come and pray to me.  I will listen to you.  You will seek me

12   and find me when you seek me with all your heart.  I will be

13   found by you, declares the Lord, and will bring you back from

14   captivity.  I will gather you from all the nations and places

15   where I have banished you.  I will bring you back to the place

16   from which I carried you into exile."

17          God's word touches my heart every day.

18          Dear Judge, I want to sincerely ask you to give me a

19   chance, give my family a chance.  I want to apologize for my

20   actions again to my former employer and promise that I will

21   never do anything to break the law again.

22          Thank you very much for giving me the time to speak,

23   your Honor.  God bless you.

24          THE COURT:  I just want to make sure Mr. Xu is okay

25   to go forward.

20181ixus

1            Take your time.

2            (Pause)

3            THE COURT:  The Court's task is to determine what

4    sentence is sufficient, but no more than necessary to achieve

5    the goals of the sentencing laws as they apply to Mr. Xu and to

6    this case.  To do that, I have considered, as required to, all

7    the factors set forth in 18 U.S.C. Section 3553(a).  In doing

8    that, I have not only reviewed the presentence report, but I've

9    also carefully considered the extensive written submissions by

10   the lawyers in this case and I have carefully considered what

11   everybody's had to say here today.

12           The starting point, we are told by higher courts, is

13   what the guideline calculation yields.  That is set forth as

14   modified, and I'll get to the modifications in a second, at

15   paragraphs 32 through 46 of the presentence report.

16           The base offense level for violations of 18 U.S.C.

17   Sections 1831 and 1832 is found in Section 2B1.1.  Because the

18   offenses of conviction have a statutory maximum term of

19   imprisonment of less than 20 years, the base offense level is

20   6.  Because the Court has already made the finding that the

21   value of the proprietary source code was between

22   three-and-a-half and nine-and-a-half million dollars, there is

23   an increase of 18 levels.  So that's an adjustment to paragraph

24   33 of what's in the PSR.  Because a substantial part of the

25   offense conduct was committed in China, there is a two-level

1    enhancement pursuant to Section 2B1.1(b)(10)(B).  Also, because

2    the offense benefited a foreign government -- that is, the

3    People's Republic of China -- there is a four-level enhancement

4    pursuant to Section 2B1.1(b)(13)(B).  And, finally, because

5    Mr. Xu used a special skill that significantly facilitated the

6    commission and concealment of the offense, there's a two-level

7    enhancement pursuant to Section 3B1.3.  All this yields an

8    adjusted offense level of 32, but three levels come off because

9    Mr. Xu demonstrated in a timely fashion his acceptance of

10   responsibility as reflected in his guilty plea.  That's

11   pursuant to Sections 3E1.1(a) and (b).  This results in a total

12   offense level of 29.  And because Mr. Xu has no criminal

13   history and is, therefore, in criminal history category I, the

14   applicable guideline range is 87 to 108 months.  So that's the

15   math.

16           In terms of the other 3553(a) factors, as I said, I

17   have considered all of them.

18           Starting with Mr. Xu's personal history and

19   characteristics, you know, obviously, this case is tragic in

20   the sense that Mr. Xu is somebody who is very talented and very

21   driven.  He made sure he got himself a top-notch education that

22   landed him the job that it did with the victim company.  And

23   the story of his family and his fiancee is -- it's heart

24   breaking.  He is the only child of two individuals whose son is

25   imprisoned in another country.  Mr. Xu's father is facing some

very serious health issues that make it so that it's unclear

how long he will live, and that is very sad.  And I think the

story of Mr. Xu's fiancee is both tragic and admirable; tragic

in the sense that their wedding plans were disrupted by

Mr. Xu's arrest in this case, admirable in the sense that, at

least for now, his fiancee is committed to see the relationship

through.  And it's always a sad sentence when the person being

sentenced doesn't have someone in the back of the courtroom

and, for understandable and obvious reasons, that is the case

with Mr. Xu.

          And I accept at face value what it is that he and his

very fine attorneys have said, in particular what Ms. Marek

said today about Mr. Xu being a low risk of recidivism.  I

accept that.  I think he certainly feels ashamed and humbled by

his arrest and conviction in this case.  And I think he,

obviously, feels particularly bad about what his imprisonment

here has meant to his family.  So I've taken all of that into

consideration, of course.

          In terms of the some of the factors that focus on the

offense conduct -- the need to impose a sentence that promotes

respect for the law, provides for just punishment, reflects the

seriousness of the criminal conduct, and accounts for general

and specific deterrence -- this was very serious conduct in the

sense that a very valuable piece of intellectual property that

took decades to develop that has a market value, as I said, I

1    think in the millions, was stolen.  And it was stolen by

2    somebody who used his special skills and his expertise and the

3    position of trust that he was in in the company.  And he

4    violated all the rules that the company had in place to protect

5    its valuable intellectual property.  And he did it for money.

6           He started his company and he used the source code

7    information to create products that he was selling.  And, as

8    Mr. Allee has pointed out, Mr. Xu, on the one hand, went to

9    great lengths to make sure that it would not be discovered that

10   he had taken this proprietary information from the company, but

11   he didn't protect it with the same sort of vigor that the

12   company protected it.  And, indeed, he sold products based off

13   the source code information to agencies of the People's

14   Republic of China, including the PLA.  And that's very serious.

15   And that is a classic economic espionage case.

16           I'll talk more about this in terms of the unwarranted

17   disparity.  I think it doesn't exaggerate things to say this

18   was very serious conduct.  Mr. Xu intended to do it.  He tried

19   to cover his tracks.  He did it over a period of time.  I

20   already talked about some of the other things he did even after

21   he left the company in terms of trying to stay current and

22   conceal what it was he was doing.

23           You know, there's been a back and forth about

24   deterrence and the need to avoid unwarranted disparity.  I

25   think general deterrence is a substantial factor here because

1    people need to understand, even if they're halfway around the

2    world, that, when they steal proprietary information, when they

3    engage in the kind of economic espionage that was done here,

4    that there is a serious consequence to be paid.

5            The people who enacted this statute that created the

6    crime that led us here today explain exactly why this was

7    something that had to be seriously dealt with.  And I don't

8    know if I would go so far as to say that a sentence of time

9    served would invite the conduct, but I can certainly understand

10   the argument that it would not provide the deterrent that is

11   necessary to protect things like the source code and other

12   valuable trade secrets and other valuable information.

13           I've already talked about specific deterrence.

14           And I think, in terms of the unwarranted disparity,

15   I, too, tip my cap to counsel's efforts to canvass all the

16   cases that are covered by the statute.

17           And let me just say this, Mr. Xu, and to anybody else

18   who reads the transcript of this proceeding.  If a person's

19   sentence could depend on the quality and the quality of the

20   work that their lawyers did, then everybody would be a lock for

21   probation, as far as I'm concerned, based on the work that

22   Mr. Xu's counsel did.

23           The fact that this was pro bono makes it more

24   extraordinary.  But even if you were getting paid a gazillion

25   dollars, this was ordinary work from the very beginning of this

1    case until the very end.  As far as I'm concerned, you all are

2    invited to come up here any time to represent people in

3    criminal or civil cases.  I really mean that.  I think

4    counsel's work was quite admirable and extraordinary.

5             And I think that there are some fair points to be

6    made.  It does seem as though the vast, vast majority of people

7    sentenced under this statute are sentenced within zero to 24

8    months.  And everybody recognizes there's always a little bit

9    of an apples-to-oranges comparison here.  There are things

10   about those cases that none of us can really know based on the

11   publicly available information.  And there are some things

12   about this case that I think arguably distinguish it from some

13   of those cases, I mean, obviously, the specter of the

14   information being shared with some of the Chinese Government

15   agencies and some of the other things I've already talked

16   about.  But it's certainly a factor that I think does merit a

17   sentence below the guideline range, so let me just speak to

18   that.

19            I do think that there are some factors that argue for

20   a sentence below the guideline range.  One of them I talked

21   about in terms of the need to avoid unwarranted disparity.  I

22   think the situation with Mr. Xu's family is just tragic and

23   it's also a factor I've considered here.  I also think it's

24   relevant -- not dispositive, but it's relevant that Mr. Xu

25   didn't sell or otherwise give away the source code itself,

1    because that was the crown jewel.  Yes, he was not careful in

2    how it is that he maintained it and, yes, he did seek to profit

3    from it.  And even selling products based on that source code

4    undermine the value of the source code to the victim company.

5    I get that.  But I think if you had a case where somebody sold

6    the source code and somebody didn't sell the course code, I

7    think that those two people should not be sentenced to the same

8    amount of time.

9              So where I come out on all of this is that, based on

10   all the 3553(a) factors, it's the judgment of the Court that

11   Mr. Xu be sentenced to the custody of the Attorney General for

12   a period of 60 months.

13             In terms of supervised release, I think that doesn't

14   really make any sense.  I think the overwhelming likelihood is

15   that Mr. Xu is going to be deported.

16             Government, do you have a different view?

17             MR. ALLEE:  No, your Honor.

18             THE COURT:  Ms. Marek, I take it you don't have a

19   different view.  Right?

20             MS. MAREK:  Correct, your Honor.

21             THE COURT:  All right.

22             So, because Mr. Xu is as close to a lock for

23   deportation, I think imposing supervised release is really

24   unnecessary.

25             Forfeiture.

1        MR. ALLEE:  We're not seeking forfeiture partially

2   for the reasons you just described in terms of making a

3   recovery.

4        We're also not pursuing restitution.  Our argument is

5   loss; not actual loss, but intended loss.

6        THE COURT:  Okay.

7        So the only other financial penalty then, or the only

8   financial penalty, is the special assessment.  That is $600, as

9   it must be.  It's a hundred dollars per count.

10        I recognize this is an extraordinarily high sentence.

11   And I know, back in China, this will come as a shock for all

12   that it means in terms of Mr. Xu's family and, in particular,

13   his father's health and his fiancee's plans for the future.  On

14   the other hand, this was very serious conduct that had

15   potentially very serious ramifications.  This was thievery on

16   the highest order of an extremely valued piece of intellectual

17   property that just when you say it took three decades to

18   develop I think gives one a sense of just how important this

19   was to the company.  And I'm not even talking about in terms of

20   just monetary value.

21        But, as I said, I think that there are some

22   mitigating circumstances that justify a sentence below the

23   guideline range.  I didn't go any lower principally because of

24   the seriousness of the conduct, but, also, general deterrence.

25   And I think, in the world of people who are contemplating this,

1    knowing that they could get a sentence of 60 months, I think it

2    sends the appropriate message and hopefully deters people so

3    that they don't have to worry about being separated from their

4    fiancees and their families and everything else.

5              Is there anything you would want in the judgment,

6    Ms. Marek?

7              MS. MAREK:  No, your Honor.  We really don't have a

8    particular place because --

9              THE COURT:  Right.  No, I understand.

10             MS. MAREK:  If he's transferred far, it might be nice

11   if -- I'll come up to New York to see him.  But somewhere maybe

12   where there is -- I think where he's been now, in Brooklyn, he

13   can have e-mail and call home, which, in White Plains, I know

14   it's different with pretrial holding, but if there's a way to

15   look into maybe where there are some other Chinese inmates and

16   where there is an ability for him to at least have that

17   communication through the telephone, you know, home to China.

18   I don't have that information.

19             THE COURT:  I would think any facility would have

20   calling capabilities.  And I'm a little leery of saying, hey,

21   are there other people who are of Chinese descent.  I think

22   that gets a little tricky for everybody.

23             MS. MAREK:  Certainly.

24             THE COURT:  I'll just rely on the diversity of the

25   United States and hope that, wherever he lands, that he can

1      make friends whether they're of Chinese ancestry or not.

2                  MS. MAREK:  Okay.  Those would be our only concerns.

3                  THE COURT:  All right.

4                  And there are no open counts to deal with or anything

5      along those lines, right?

6                  MR. ALLEE:  Correct, your Honor.

7                  THE COURT:  All right.

8                  Mr. Xu, you do have a right to appeal this sentence.

9      You have to file a notice of appeal within 14 days of when the

10     judgment is entered.  You can talk to your lawyers about that.

11                 Again, I want to thank counsel, all counsel in this

12     case, but particularly counsel who have had to travel great

13     distances and have done a tremendous amount of work.  Please

14     pass on the same to your colleagues who are not here.  It's

15     been a real pleasure to watch you work and to read your work,

16     and I hope our paths cross again.

17                 And the government as well.  Thank you for all your

18     efforts in this case.

19                 We're adjourned.

20                 MR. ALLEE:  Thank you.

21                 MR. DIFFLEY:  Thank you, your Honor.

22                 MS. MAREK:  Thank you, your Honor.

23                            - - - -

24

25